IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN ILLINOIS

LLOYD KEIBER,                          )
                                       )
                    Plaintiff,         )
                                       )    No.   08 CV 2616
        v.                             )
                                       )    Hon. Michael T. Mason
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security        )
                                       )
                    Defendant.         )


## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge.

Plaintiff, Lloyd Keiber ("Keiber" or "claimant"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Keiber's claim for Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 216(i) and 223(d). The Commissioner filed a cross-motion for summary judgment requesting that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Keiber's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

## I.    BACKGROUND

### A.    Procedural History

Keiber filed an application for DIB on May 13, 2005, alleging a disability onset date of August 11, 2004. (R. 71-73). His claim was denied initially on September 2,

2005 and again on December 2, 2005 after a timely request for reconsideration. (R. 62-64, 66-68). Thereafter, Keiber requested a hearing, which was held on September 19, 2006 before Administrative Law Judge Daniel Dadabo ("ALJ Dadabo" or "ALJ"). (R. 39, 460-516). On December 24, 2007, ALJ Dadabo issued a written decision denying Keiber's request for benefits. (R. 26-36). Keiber filed a timely request for review, which the Appeals Council denied on October 26, 2007. (R. 21-24). The ALJ's decision then became the final decision of the Commissioner. *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998); 20 C.F.R. § 416.1481. Keiber subsequently filed this action in the District Court.

### B.    Medical Evidence

Claimant's seeks DIB for anxiety and affective disorders. He alleges that these disabling conditions stem principally from a traumatic event that occurred on October 30, 1991 while he was the pastor of a Lutheran church. (R. 220, 318, 354). When visiting a parishioner in the hospital, he witnessed the charred, dead bodies of two young boys from his parish who had recently died in a house fire. (*Id.*). Although Keiber claimed to have been treated by various mental health professionals from 1991 to 2004, these medical records are not included in the record.[1]

Keiber saw several physicians at Centegra Health System between January 20, 2004 and July 6, 2006. (R. 263-306). Though the records of his approximately forty visits to Centegra over that period are mostly illegible, they do indicate that Keiber was

---

[1]In anticipation of his hearing in September 2006, the claimant compiled a detailed outline of his alleged medical afflictions and treatments from November 15, 1991 to July 1, 2006. (R. 140-42).

treated chiefly for anxiety and depression, and prescribed a variety of antidepressant medications, including Cymbalta, Prozac, Wellbutrin and Lexapro. (*Id.*). Because many of the Centegra records are impossible to read, this list of medications is not necessarily comprehensive.

On September 16, 2004, Lessi Smebakken ("social worker Smebakken"), a social worker, performed a Psychiatric Diagnostic Interview Examination of Keiber for approximately one hour. (R. 318-22). Keiber reported suffering from severe depression and anxiety that began after viewing the two dead boys. (R. 318). He stated he was taking Effexor (an antidepressant) and Provigil (a medication promoting wakefulness) at the time. (R. 319). Smebakken observed that Keiber exhibited a depressed mood and anxious affect, although she also noted that he demonstrated good short-term and long-term memory as well as fair attention span and concentration. (R. 320). She diagnosed him with post-traumatic stress disorder ("PTSD") and assigned a Global Assessment of Functioning ("GAF") score of 60. (R. 321). This score indicates "moderate symptoms or any moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. Am. Psychiatric Ass'n 1994) ("DSM-IV").

Keiber first saw Dr. Afshan Hameeduddin ("Dr. Hameeduddin"), a family practice physician, on October 19, 2004. (R. 202). He reported "not feeling well for the last 3 to 4 weeks," experiencing fatigue, not sleeping well and feeling "extremely depressed." (*Id.*). Dr. Hameeduddin observed that Keiber was "awake" and "alert," although "sick looking." (*Id.*). He diagnosed him with "symptoms suggestive of mostly a viral syndrome" as well as "major depression." (*Id.*).

On December 3, 2004, Keiber saw Dr. Hameeduddin again and reported extreme fatigue, confusion, recurrent mental status changes, a racing heart and chest pains. (R. 197-98). Dr. Hameeduddin diagnosed him with fatigue, confusion and an intermittent twitching sensation. (R. 198).

Dr. Amarish Dave ("Dr. Dave"), a neurologist, examined the claimant on December 27, 2004. (R. 199-201). Keiber complained of weakness, pain all over his body, forgetfulness and clumsiness, and claimed to have a history of PTSD. (R. 199-200). Dr. Dave stated that claimant's symptoms could be explained solely by PTSD, but he ordered a magnetic resonance imaging ("MRI") scan of Keiber's brain to explore any structural or biological factors that might be causing his symptoms. (R. 200).

According to the reviewing radiologist, the MRI, taken on January 7, 2005, revealed "a significant degree of cortical atrophy of both cerebral hemispheres, particularly near the vertex" with a degree of cortical atrophy significantly greater than that of a normal individual Keiber's age. (R. 157). After reviewing the MRI on January 10, 2005, Dr. Dave stated that Keiber's brain atrophy was "difficult to correlate with symptoms" and that the findings did not necessarily indicate there was a specific problem. (R. 196). He recommended that claimant undergo a spinal tap to rule out the possibility of chronic infectious etiology or another inflammatory process. (*Id.*).

Keiber saw Dr. Hameeduddin again on February 15, 2005 and appeared alert, awake and in no apparent distress. (R. 195) He reported that he was in an "okay" mood. (*Id.*). Dr. Hameeduddin noted that the spinal tap recently performed was negative. (R. 195, 203-05). He diagnosed Keiber with chronic fatigue and severe cortical atrophy. (R. 195).

Social worker Smebakken performed a second Psychiatric Diagnostic Interview Examination of Keiber on April 5, 2005. (R. 254-58). The claimant stated he was taking two medications at the time: Cymbalta and Clonazepam (for panic disorders). (R. 255). He reported having no energy and a lack of motivation. (R. 254). Keiber also mentioned that his fifteen-year-old daughter had recently been diagnosed with a hematoma on the brain, which required very expensive medication. (*Id.*). Smebakken observed that Keiber was well-groomed, had good short-term and long-term memory, had fair attention span and concentration, and appeared to be obsessed with his health. (R. 256). She diagnosed him with PTSD and, as before, assigned a GAF score of 60. (R. 257).

More than one month after Keiber applied for DIB on May 13, 2005, Dr. Ann Callison, a psychiatrist, examined Keiber on June 24, 2005. (R. 208-11). She noted that she had seen Keiber on a monthly basis from February 10, 1999 through August 25, 2003. (R. 208). However, documentation of these visits is not contained in the record. On June 24, 2005, Dr. Callison observed that Keiber was well-mannered, neatly dressed, well-groomed, fully oriented and exhibited good abstract thinking and judgment, although he also demonstrated poor focus and multiple shifts of attention. (R. 208-10). Keiber reported having symptoms correlated with PTSD, panic disorder, major depression and attention deficit disorder, and stated that in the past, he responded positively to Prozac and Xanax, an anti-anxiety medication. (R. 208, 211). Dr. Callison noted that Keiber had changed jobs several times and had been unable to maintain steady work, although she never opined on whether Keiber would be unable to work in the future. (R. 211).

5

On July 4, 2005, claimant went to the emergency room after a sudden onset of redness on his forehead and a 102.0 degree fever. (R. 215-16). He was diagnosed with cellulitis, which was "probably secondary to an insect bite." (R. 216).

The Illinois Department of Human Services referred Keiber to Dr. Frank Elmudesi ("Dr. Elmudesi,"), a psychiatrist, for a clinical interview and mental status examination. (R. 220-22). On August 13, 2005, Dr. Elmudesi spent approximately one hour interviewing claimant. (R. 220). Keiber reported suffering from depression and anxiety episodes ever since he witnessed the charred bodies of the two boys in 1991. (*Id.*). He also stated that he felt increasingly uncomfortable around people, hypervigilant, experienced memory problems and had difficulty relaxing. (R. 220-21). He claimed to be taking three psychotropic medications at the time of the interview: Cymbalta, Clonazepam and Ritalin. (R. 221).

Dr. Elmudesi observed that Keiber displayed a clean and neat appearance, and was "alert and fairly well oriented in all spheres." (R. 221). He observed no psychotic signs, symptoms or any hallucinations. (*Id.*). He found that the claimant exhibited fair judgment and insight, a friendly and cooperative demeanor, and had an intact memory. (R. 221-22). Dr. Elmudesi stated that Keiber showed classic PTSD symptoms, including hypervigilance, nightmares, avoidance of discussing the traumatic event, physical and emotional tension, decreased concentration and proneness to distractibility. (R. 221). He also noted lethargy and mild difficulty with basic tasks of concentration and mental flexibility. (R. 222). Dr. Elmudesi concluded that Keiber had a history of depression and PTSD that had "culminated into a persistent clinical depression." (*Id.*).

6

Shortly after his examination with Dr. Elmudesi, Keiber underwent a mental residual functional capacity ("RFC") evaluation with Dr. Carl Hermsmeyer ("Dr. Hermsmeyer"), a psychologist, on August 29, 2005. (R. 237-39). Dr. Hermsmeyer concluded that claimant was not significantly limited in his ability to remember locations and work-like procedures, understand and carry out very short and simple instructions, maintain extended concentration, perform activities within a schedule, make simple work decisions, respond to changes in his work setting and interact appropriately with co-workers. (R. 237-38). He found that Keiber was moderately limited in his ability to understand, remember and carry out detailed instructions. (R. 237). Dr. Hermsmeyer opined that the claimant had depression and PTSD, but retained the "mental capacity to perform simple one and two-step tasks at a consistent pace." (R. 239).

On April 18, 2006, Keiber saw Dr. Chowdary Jampala ("Dr. Jampala"), a psychiatrist, for treatment of PTSD and panic disorder. (R. 351-53). Keiber reported having recurring memories of the traumatic incident from 1991, crying spells, panic attacks, a racing heart, memory problems and obsessive thoughts. (R. 351). He claimed to have stopped taking Cymbalta three weeks before because he felt it was preventing him from returning to work. (*Id.*). Dr. Jampala diagnosed Keiber with chronic PTSD as well as panic disorder with agoraphobia. (R. 353). He assigned a GAF score of 50, indicating "serious symptoms or any serious impairment in social, occupational, or school functioning." (*Id.*); DSM-IV at 32.

On July 3, 2006, the claimant underwent a Psychiatric Diagnostic Interview Examination with Laurieanne Chutis, a social worker, for approximately one hour. (R. 307-11). Keiber reported persistent depression, anxiety and sadness. (R. 307). He

7

also mentioned having suicidal thoughts a week earlier. (R. 309). Chutis observed that Keiber exhibited an "angry-afraid" mood, with "ok" short-term memory, good long-term memory, "very bad" attention span and "poor" concentration. (*Id.*). She diagnosed him with PTSD, panic disorder with agoraphobia and Tourette's Disorder, and assigned a GAF score of 50. (R. 310).

Dr. Robert Kohn ("Dr. Kohn"), a neuro-psychiatrist, examined Keiber on August 17, 2006 and completed a mental impairment questionnaire. (R. 335-38). Keiber stated he was taking three medications at the time: Dexedrine (a medication promoting wakefulness), Xanax and Prozac. (R. 335). The doctor noted that claimant demonstrated decreased energy, feelings of guilt or worthlessness, and mood disturbance. (R. 336). Dr. Kohn diagnosed Keiber with atypical bipolar disorder, obsessive compulsive disorder, attention deficit hyperactivity disorder ("ADHD"), PTSD and Tourette's Disorder. (R. 335). He assigned a GAF score of 50-55. (*Id.*). Additionally, Dr. Kohn opined that claimant's impairments would cause him to miss work more than four days a month and resulted in marked restrictions in daily living and social functioning. (R. 337-38). He specifically advised that Keiber should be kept from returning to his previous position of pastor. (R. 338).

Dr. Jampala examined claimant again on August 29, 2006, and completed a mental impairment questionnaire. (R. 339-42). He stated that Keiber showed decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, difficulty thinking or concentrating, change in personality, and autonomic hyperactivity. (R. 340). Dr. Jampala diagnosed Keiber with PTSD, panic disorder with agoraphobia, Tourette's disorder and ADHD, and assigned a GAF score of 50. (R. 339). Dr. Jampala

concluded that Keiber would miss more than four days of work per month, had marked restriction of activities of daily living and had extreme difficulty in maintaining social functioning. (R. 341).

More than two months after Keiber's September 19, 2006 hearing, Keiber was examined by the state agency psychologist, Dr. John Peggau ("Dr. Peggau"), on November 28, 2006. (R. 354-58). Dr. Peggau stated that he spent three hours with the claimant, although Keiber later claimed the examination only lasted forty minutes. (R. 358, 377). Keiber complained of inconsistency, "risky and violent outbursts" and ADHD. (R. 354). He claimed that his symptoms worsened in the previous three or four years. (*Id.*). Dr. Peggau observed that Keiber showed no signs of Tourette's, spoke intelligibly, had a euthymic mood and an appropriate affect, and possessed an intact memory. (R. 355-57). Psychological testing administered to Keiber placed him in the "High Average range" with an estimated verbal I.Q. of 116, performance I.Q. of 114 and full-scale I.Q. of 114. (R. 356). Dr. Peggau diagnosed Keiber with bipolar I disorder, mild-moderate PTSD and low self-esteem, and assigned a GAF score of 59. (R. 358). This score indicates "moderate symptoms or moderate difficulty in social, occupational or school functioning." DSM-IV at 34. The doctor opined that Keiber was able to "understand, remember, sustain concentration and persist in tasks" as well as "interact socially and adapt to work settings." (*Id.*).

### C. Claimant's Testimony

At the time of the September 19, 2006 hearing, Keiber was a fifty-year-old individual living with his wife and two daughters in Harvard, Illinois. (R. 465, 470). He graduated college and then earned a Master of Divinity degree. (R. 465). Keiber

previously worked as the pastor of several parishes and then in many sales positions. (R. 478-79, 485-87).

The claimant testified that while he was a pastor in 1991, he was severely traumatized after seeing the burnt bodies of two young parishioners to whom he had been a "father figure." (R. 484-85). Following that, he was unable to remain at his parish and moved to several new pastor positions before leaving the ministry altogether. (R. 484-87). He proceeded to hold various positions in sales, including working for Merrill Lynch and a software company, until injuring his head in a skiing accident in 2003. (R. 479-80). Claimant testified this injury exacerbated his anxiety and affective disorders. (*Id.*). He testified that he had persisted in posting his resume on the Internet, but had been unable to secure a new job. (R. 499-500).

Keiber claimed that there was no typical day for him because he felt so different from day to day. (R. 468). He stated that some days he feels normal, lucid and energetic, while other days he feels fatigued, anxious and panicked and experiences racing thoughts. (R. 468-70). He has difficulties being in crowds and has a panic attack approximately once every week. (R. 469-70). Over the course of his problems, he has taken a variety of psychotropic medications. (R. 465-66).

On a good day, claimant can go to his daughters' baseball games, sit by himself, and watch the game. (R. 470). Keiber testified that he was able to go on a cruise with his family, but he was so panicked by the environment that he spent 80 percent of the time sleeping in his cabin. (R. 475). He often lifts weights to help relieve tension. (R. 472). During his testimony, Keiber broke down into crying spells multiple times. (R. 484, 496).

10

In addition to his oral testimony, claimant composed several lengthy and detailed letters over the course of this litigation that are included in the record.  (R. 13, 386, 397, 422-24, 456-59).  Keiber's letters span from November 28, 2006 to January 26, 2008.  (*Id.*).  The subject of these letters ranges from litigation strategy to Keiber's mental status to his medical treatments.

### D.    Testimony of Claimant's Wife

The claimant's wife, Susan Keiber ("Mrs. Keiber"), testified at the September 19, 2006 hearing.  (R. 492-98, 500-08).  Mrs. Keiber is a practicing nurse.  She described her husband as "consistently inconsistent," with his mood and behavior varying widely from day to day.  (R. 492).  She stated that she was unsure whether he would be able to keep a schedule if he held a job.  (R. 493).  Mrs. Keiber testified that her husband sleeps a lot, often feels exhausted, seldom completes tasks, is fearful of being in crowds, experiences paranoia and has several crying spells every week.  (R. 493, 496, 501).  She stated that claimant has expressed suicidal thoughts on occasion and sometimes slips into fits of rage, such as when he angrily threw a knife into the kitchen floor.  (R. 505, 507-08).  She said that her husband's only hospitalization in the previous year was for cellulitis.  (R. 502-03).

Mrs. Keiber described her husband as very reluctant to leave the house because of his anxiety, often remaining inside all day for four to five days of the week.  (R. 504-05).  She said her husband was able to go on two cruises with the family, the first in 2004, which lasted four days, and the other in 2005, which lasted seven days.  (R. 496).  However, she stated that claimant was exhausted throughout the cruises and slept a great deal of the time.  (R. 497).  She mentioned that he was able to take his family to a

theme park in the Wisconsin Dells and even rode on go-carts with his two girls, but was too exhausted to join his family for all their activities. (R. 498). According to Mrs. Keiber, her husband's condition clearly worsened after his skiing accident in 2003. (R. 506).

**E.     Vocational Expert's Testimony**

Linda Gels, a vocational expert ("VE Gels"), also testified at the hearing. (R. 510-15). The VE testified, that from 1983 to 1996, Keiber worked as a pastor, which was a skilled and light position. (R. 511). VE Gels observed that from 1996 to 2004 Keiber worked at a variety of positions that could be classified as sales agent (business services) and sales representative, both of which were skilled and light. (*Id.*).

The ALJ first asked the VE to determine if a hypothetical individual with the same educational and work background as the claimant, who retains a light functional capacity and is only able to perform unskilled, routine work that does not involve public contact or more than superficial interactions with others, would be able to perform any of claimant's past jobs. (R. 512). VE Gels opined that such a person would not be able to return to any of claimant's prior positions, but could perform unskilled, light work with the additional restrictions posed by the ALJ by working as a cleaner/housekeeper. (*Id.*). The VE stated there were approximately 7,000 cleaner/housekeeper jobs in the Chicagoland standard metropolitan statistical area. (*Id.*).

The ALJ next asked VE Gels how this hypothetical individual's ability to perform the job of cleaner/housekeeper would be affected if, in addition to the aforementioned limitations, he had very poor coping mechanisms, was unable to adapt to routine workplace changes and would overlook details of job completion. (*Id.*). The VE

12

responded that this individual would be unable to perform even a simple job. (*Id.*).

The ALJ then asked how this hypothetical individual's ability to perform the job of cleaner/housekeeper would be affected if he was emotionally fragile on a recurrent basis, including having angry or tearful breakdowns in front of co-workers at least once a week. (R. 513). The VE opined that this behavior would preclude working as a cleaner/housekeeper because it would be too disruptive to the workplace. (R. 513-14).

The ALJ next asked how being unable to complete his schedule four to five times per week, perhaps completing as little as half of his work, would affect this individual's ability to sustain the position of cleaner/housekeeper. (R. 514). The VE again stated that this individual would be unable to sustain work at the position. (*Id.*).

Next, the ALJ inquired as to the thresholds of what the workplace would tolerate with an emotionally distressed individual. (*Id.*). The VE testified that a person consistently unproductive for 10-15 percent of the day would be unable to meet competitive work demands. (R. 514-15).

The ALJ then asked about the consequences of the hypothetical individual having recurring absences more than one or two times every month. (R. 515). The VE opined that these absences would be incompatible with sustaining work as a cleaner/housekeeper. (*Id.*).

Finally, the ALJ asked about the consequences of the hypothetical individual taking recurrent, unscheduled breaks without permission. (*Id.*). Again, the VE testified that this would be incompatible with sustaining work as a cleaner/housekeeper. (*Id.*).

## II.    LEGAL ANALYSIS

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)). Our review is deferential and we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* Though the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B.     Analysis Under the Social Security Act**

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act ("Act"). An individual is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

14

continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).

In determining whether a claimant is disabled, the ALJ must perform the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five-step analysis.  At step one, ALJ Dadabo found that Keiber had not engaged in substantial gainful activity since August 11, 2004, the alleged onset of disability.  (R. 31).  At step two, the ALJ found that claimant's anxiety and affective disorders were severe impairments.  (*Id.*).  At step three, the ALJ determined that the claimant did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526)."  (*Id.*).  Next, the ALJ concluded that Keiber had the RFC to "perform light unskilled work of a routine nature that does not involve contact with the public or more than superficial interaction with others."  (R. 33).  At step four, the ALJ determined that the claimant was unable to perform any past relevant work.  (R. 34).  At step five, the ALJ found that there were a

15

significant number of jobs in the national economy that Keiber could perform.  (R. 35).

Keiber argues that the ALJ failed to properly weigh the opinions of his treating physician and psychiatrists.  He also contends that the ALJ erred by ignoring significant medical evidence in his favor.  Keiber further argues that the ALJ's credibility determination was legally insufficient.  Next, the claimant contends that the ALJ erred by ignoring portions of the VE's testimony that were favorable to him.  Finally, Keiber argues that the ALJ erred by failing to identify and resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles.

### C. The ALJ Properly Weighed the Opinions of Claimant's Treating Physician and Psychiatrist

Keiber contends that ALJ Dadabo erred by failing to give controlling weight to the conclusions of his treating physician, Dr. Jampala, and by rejecting the opinion of Dr. Kohn while accepting Dr. Peggau's opinion.  In his ruling, the ALJ discusses the weight given to each physician and the rationale behind his decision.

An ALJ should generally give a treating physicians' opinions controlling weight because they are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition.  20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances.") (quotation omitted).  However, the ALJ is free to discount the opinion of the treating physician so long as he provides good reasons for doing so.  20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870.  While different medical opinions must be considered in evaluating a claimant's medical impairments, "the final responsibility for deciding these issues is

reserved to the Commissioner."  20 C.F.R. § 404.1527(e)(2); *see Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990).

Keiber argues that the ALJ erred in failing to give the opinion of his treating physician, Dr. Jampala, controlling weight.  In his ruling, ALJ Dadabo explained the little weight given to Dr. Jampala's August 29, 2006 opinion.  (R. 34).  The ALJ stated that Dr. Jampala's statement that Keiber had extreme mental limitations, "cannot be accepted at face value" because it was not supported in the accompanying progress notes.  (*Id.*).  In these accompanying progress notes, Dr. Jampala previously stated that the claimant was "conscious," "alert," "cooperative," showed no signs of suicidal ideation, had no formal thought disorder, exhibited no signs of guilt or worthlessness, had only mildly impaired attention and concentration, and often reported improvement in his condition.  (R. 345-48, 350, 352-53).  These are the type of internal inconsistencies that justify an ALJ discounting a treating physician's opinion.  *See* 20 C.F.R. § 404.1527(c)(2); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence").  Additionally, Dr. Jampala's opinion that Keiber had extreme mental limitations was inconsistent with the record as a whole, which justifies discounting his opinion.  20 C.F.R. § 404.1527(d)(2)(ii)(4).  This further demonstrates that the ALJ did not err in discounting the opinion of Dr. Jampala.

Keiber also contends that the ALJ erred by affording the opinion of Dr. Kohn limited weight.  More specifically, the claimant argues that the ALJ wrongly discounted Dr. Kohn's opinion because he "saw [the] claimant only once," while relying on the opinion of Dr. Peggau, who also saw the claimant only once.  (R. 34).  When determining the weight to give a medical source, an ALJ may consider, *inter alia*, the length and

extent of the treating relationship. 20 C.F.R. § 404.1527(d)(2). The ALJ did just that when he noted that Dr. Kohn only saw Keiber once. (R. 34). The ALJ's decision to afford little weight to the opinion of Dr. Kohn is unrelated to the ALJ's decision to rely, in part, on the opinion of Dr. Peggau. Even so, as the state agency psychologist, Dr. Peggau is considered a highly qualified expert in Social Security disability evaluation. 20 C.F.R. 404.1527(f)(2)(i). Additionally, Dr. Peggau reported that he examined Keiber for approximately three hours and provided findings consistent with the record as a whole. Consequently, the ALJ did not err in giving Dr. Kohn's opinion limited weight.

### D. The ALJ Properly Considered the Evidence in its Entirety

Keiber next argues that ALJ Dadabo erred by failing to consider the evidence in the entirety. Specifically, claimant contends that the ALJ ignored information favorable to him in Dr. Elmudesi's and Dr. Hermsmeyer's evaluations.

The ALJ is not required to address every piece of testimony and evidence in the record. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 2005)*; Carroll v. Barnhart*, 291 F.Supp.2d 783, 798 (N.D. Ill. 2003) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). However, the ALJ cannot discuss only the evidence that favors his ultimate conclusion. *Diaz*, 55 F.3d at 307; *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). The Seventh Circuit has stated that "[w]here a claimant argues that there are fatal gaps or contradictions in the administrative law judge's opinion, thus appealing to the important principle of administrative law that the agency provide a rational articulation of the grounds of its decision, we give the opinion a commonsensical reading rather than nitpicking it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

In this case, the ALJ spent several pages of his opinion detailing and analyzing

Keiber's medical history. (R. 31-34). However, claimant argues that the ALJ erred by including Dr. Elmudesi's observations that Keiber was "friendly and cooperative," while omitting Dr. Elmudesi's diagnoses of depression and PTSD. Yet, Keiber neglects to mention that ALJ Dadabo described similarly severe diagnoses (PTSD and bipolar disorder) from Dr. Peggau. (R. 34). Additionally, in line with Dr. Elmudesi's diagnoses, the ALJ actually concluded that Keiber suffered severe impairments from his anxiety and affective disorders at step two. (R. 31). Since the ALJ did not discuss only evidence that favored his ultimate conclusion, he did not err in discussing only portions of Dr. Elmudesi's evaluation.

Keiber likewise argues that the ALJ erred by failing to consider Dr. Hermsmeyer's statement that Keiber could "perform simple one and two-step tasks at a consistent pace." (R. 239). However, as previously noted, ALJ Dadabo considered opinions from Drs. Jampala, Kohn and Peggau that did not support the ALJ's ultimate conclusion about the claimant's limitations. (R. 34). It is also significant to note that other excerpts of Dr. Hermsmeyer's evaluation, which the ALJ never discussed, are considerably unfavorable to Keiber. (R. 237-38). Because ALJ Dadabo considered several other contrary opinions and "an ALJ need not provide a complete written evaluation of every piece of evidence," we see no reason to remand on this issue. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).

### E.     The ALJ's Credibility Determination is Not "Patently Wrong"

Next, Keiber contends that the ALJ erred in finding that his statements "concerning the intensity, persistence and limiting effects" of his condition are not entirely credible. (R. 33). We disagree. ALJ Dadabo adequately discussed his reasons for

19

finding that Keiber's statements regarding his symptoms were "not entirely credible."  (R. 33-34).

Since the ALJ is in a superior position to judge the credibility of the claimant, the ALJ's credibility finding will only be reversed if it is "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  However, the ALJ must comply with the requirements of Social Security Ruling 96-7p ("SSR 96-7p") when assessing the credibility of statements supporting a Social Security application.  *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 942 ( 7th Cir. 2002)).  SSR 96-7p requires that the "reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p.  Furthermore, SSR 96-7p requires that the ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*

Here, ALJ Dadabo based his credibility determinations on several facts and observations.  The ALJ described pieces of medical evidence that are inconsistent with Keiber's description of his symptoms.  The ALJ noted that, despite Keiber's claims regarding the severity of his symptoms, he has not been hospitalized for his anxiety or affective disorders.  (R. 33).  The ALJ additionally observed that the claimant's contentions of experiencing severe symptoms are not reflected in many of the medical records.  (R. 33-34).  The ALJ noted that Keiber's symptoms of "anger, agitation, panic,

impulsivity, hyperactivity, and depression" were mainly described as "OK" by examining mental health professionals, and his most recent examination yielded a GAF score of 59, indicating only "moderate difficulty in social or occupational functioning." (R. 34).

The ALJ further concluded that Keiber's lifestyle was inconsistent with the degree of incapacitation he claimed. (R. 34). The ALJ relied on testimony that Keiber was able to drive, attend his daughters' baseball games and even take two trips out of the country in the past three years. (*Id.*). Moreover, the claimant's ability to pay his family's bills, read his e-mails every day and compose several "carefully typed, single-spaced explanations of his mental status" factored into the ALJ's decision that the limitations claimed by Keiber "were not entirely credible." (*Id.*).

As required by SSR 96-7p, ALJ Dadabo was neither conclusory nor vague in his credibility assessment, but rather he articulated specific and clear reasons, grounded in the evidence, why the claimant's statements were "not entirely credible." (R. 33-34). Therefore, the ALJ's credibility determination was not "patently wrong" and we will not remand on this basis. *See Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong.") (quotations omitted).

### F.     The ALJ Properly Evaluated the Vocational Expert's Testimony

The claimant also argues that ALJ Dadabo erred by ignoring portions of the VE's testimony that were favorable to him. "Ordinarily, an ALJ's hypothetical questions to a VE must include all limitations supported by medical evidence in the record." *Simila v. Atrue*, 573 F. 3d 503, 520 (7th Cir. 2009)(quotations omitted). The ALJ posed several

questions to the VE and asked him to opine on a wide range of hypothetical limitations. The ALJ first asked whether a hypothetical individual with the same educational and work background as the claimant, who retains a light functional capacity and is only able to perform unskilled, routine work that does not involve public contact or more than superficial interactions with others, would be able to return to any work he had previously performed. (R. 512)**.** The VE testified that such a person would be unable to perform claimant's past work, but could perform unskilled, light work with the additional restrictions posed by the ALJ by working as a cleaner/housekeeper. (*Id.*).

The ALJ proceeded to pose five more hypothetical questions to the VE, each with additional limitations on the hypothetical individual. (R. 512-15). In response to each hypothetical question, the VE stated that the individual would be unable to sustain work at the position of cleaner/housekeeper. (*Id.*). In his decision, the ALJ relied on the VE's response to the first hypothetical question, but never discussed the VE's responses to the final five hypothetical questions. (R. 35). Claimant argues that this mandates reversal of ALJ Dadabo's decision. As a result, the claimant asks this Court to reverse the ALJ's decision.

Keiber cites *Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568850 (N.D. Ill. Dec. 7, 2001), to support his argument that the ALJ cannot ignore answers to his hypothetical questions that fail to support his decision. However, the court in *Sayles* stated, "an ALJ's decision must be based upon consideration of all the *relevant evidence*." *Id.* at *5 (emphasis original). In the present case, the ALJ found that Keiber was able to "perform light unskilled work of a routine nature that does not involve contact with the public or more than superficial interaction with others." (R. 33). Only the first hypothetical

22

question set forth the limitations which the ALJ found applied to Keiber. The five remaining hypothetical questions described an individual that was significantly more limited than the ALJ ultimately found Keiber to be and therefore, are not relevant.. The claimant essentially argues that the ALJ could not ignore VE testimony that was irrelevant to his RFC. This is required by neither *Sayles* nor any other authority in this jurisdiction. *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993); *see Hodges v. Barnhart*, 509 F.Supp.2d 726, 735-36 (N.D. Ill. 2007).

To further his argument, Keiber points to limitations set forth in the opinions of Drs. Jampala and Kohn, and states these limitations are consistent with the limitations described in the five ignored hypothetical questions. On this basis, Keiber contends that ALJ Dadabo was bound to address the VE's responses to the ignored hypothetical questions. However, earlier in his decision, the ALJ clearly set forth reasons why he afforded little weight to the opinions of these two doctors and why Keiber had less limitations than they suggested. (R. 33-34). Since only the first hypothetical question accurately reflected the claimant's limitations that the ALJ found, the ALJ was not required to explain the VE's answers to the remaining hypothetical questions. *See Latkowski v. Barnhart*, 93 Fed. Appx. 963, 974 (7th Cir. 2004) ("the ALJ committed no error in declining to analyze the vocational expert's response to . . . [a] more restrictive hypothetical because that hypothetical was based on limitations the ALJ justifiably rejected").

G.     **The ALJ's Failure to Ask About Possible Conflicts Between the Vocational Expert's Testimony and the Dictionary of Occupational Titles was Harmless Error**

Finally, Keiber contends that the ALJ erred by failing to resolve conflicts between

the VE's testimony and the Dictionary of Occupational Titles ("DOT").  Specifically, the

claimant argues that the ALJ neglected his duty under Social Security Ruling 00-4p

("SSR 00-4p") to "[a]sk the VE . . . if the evidence he . . . has provided conflicts with

information provided in the DOT; and [i]f the VE's evidence appears to conflict with the

DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict."  SSR

00-4p.

   In this case, ALJ Dadabo failed to comply with SSR 00-4p because he never

asked the VE whether her testimony was consistent with DOT.  On this basis, Keiber

finds support in *Prochaska v. Barnhart*, where the Seventh Circuit vacated and

remanded the decision of an ALJ who failed to determine whether the VE's testimony

was consistent with the DOT.  454 F.3d 731, 736 (7th Cir. 2006).  However, in

*Prochaska*, the Seventh Circuit was unable to determine whether the VE's testimony

"was actually inconsistent with DOT."  *Id.*  Unlike *Prochaska*, in the present case, there is

no conflict between the DOT and the job of cleaner/housekeeper identified by the VE.

The VE's testimony that the position of housekeeper is unskilled and light is consistent

with the DOT's description of cleaner/housekeeper as an unskilled, light position.  (R.

512); DOT # 323.687-014.  Accordingly, we find that even though the ALJ failed to

inquire about possible conflicts between the VE's testimony and the DOT, it was

harmless error.  If we remanded for the ALJ to determine whether a conflict exists

between the VE's testimony and the DOT, we are certain that the result would be the

same.  "No principle of administrative law or common sense requires us to remand a

case in quest of a perfect opinion unless there is reason to believe that the remand might

lead to a different result."  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).  Based

on the foregoing, remand is not warranted under these circumstances.

**III.    CONCLUSION**

For the reasons set forth above, Keiber's motion for summary judgment is denied

and the Commissioner's motion for summary judgment is granted.  It is so ordered.


**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: September 30, 2009**